## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| J.J.R. DISTRIBUTING CORPORATION, <br> d/b/a DISILVA FRUIT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SANDLER BROS., et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Docket No. 09-cv-210-P-S <br> ) <br> ) <br> ) <br> ) <br> ) |

### ORDER ON PLAINTIFFS' MOTION FOR ATTACHMENT AND MOTION FOR INJUNCTIVE RELIEF

This dispute arises from Defendants' alleged failure to pay promptly for perishable agricultural commodities and to maintain sufficient trust assets under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a et seq. Before the Court are Plaintiffs' Motion for Real Estate Attachment and Trustee Process Attachment (Docket # 20) and Motion for Injunctive Relief (Docket # 21), which seek provisional remedies under Federal Rules of Civil Procedure 64 and 65.[1]

Defendant Candice O'Brien's recent filing of a petition under the Bankruptcy Code[2] operates as an automatic stay, against her, of this judicial action. See 11 U.S.C. 362(a)(1); Seiko Epson Corp. v. Nu-Kote Int'l, Inc., 190 F.3d 1360, 1364 (Fed. Cir. 1999). Thus, Plaintiffs' motions are hereby MOOT as to Defendant O'Brien.

---

[1] Although Plaintiffs' Motions purport to reach all Defendants, their filings contain no information justifying attachment or injunctive relief as to Michelle L. Paulsson, a trustee of The Herbert A. Sandler Revocable Trust. Thus, the Court construes Plaintiffs' Motions as pertaining to Defendants Sandler Bros., Mark Sandler, and Marjorie Sandler only.

[2] (See Suggestion of Bankruptcy (Docket # 49).)

As explained herein, Plaintiffs' Motion for Attachment (Docket # 20) is GRANTED IN PART as to Defendant Sandler Bros. and Defendant Mark Sandler ("Mark"), and DENIED IN PART as to Defendant Marjorie Sandler ("Marjorie"). Plaintiffs' Motion for Injunctive Relief (Docket # 21) is DENIED as to all Defendants.

## I. LEGAL STANDARD

Under Maine law,[3] an order of approval of attachment or trustee process "may be entered only after notice to the defendant and hearing and upon a finding by the court that it is more likely than not that the plaintiff will recover judgment, including interest and costs," in an amount equal to or greater than the sum of the attachment plus any insurance, bond, or other security, and any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment. Me. R. Civ. P. 4A(c), 4B(c).[4] In other words, "before an attachment may be ordered, the court must find by a preponderance of the evidence that the moving party will succeed on its claim and in an amount equal to or greater than the amount of the attachment sought." Trans Coastal Corp. v. Curtis, 622 A.2d 1186, 1188 (Me. 1993).

A motion for attachment or trustee process must be accompanied by an affidavit setting forth "specific facts sufficient to warrant the required findings and shall be upon the affiant's own knowledge, information or belief." Me. R. Civ. P. 4A(i); see also id. 4B(c). A defendant opposing attachment may also file supporting affidavits. Id. 4A(c), 4B(c), 7(c).

---

[3] In accordance with Federal Rule of Civil Procedure 64, the Court looks to state law in adjudicating a motion for attachment or trustee process. See Telerent Leasing Corp. v. Pine State Plumbing & Heating, Inc., 231 F. Supp. 2d 352, 355 (D. Me. 2002).

[4] Notwithstanding the express hearing requirement, a formal hearing with oral argument is not necessary prior to ordering attachment. See S. Maine Props. Co., Inc. v. Johnson, 724 A.2d 1255, 1257 (Me. 1999).

## II. FACTUAL BACKGROUND[5]

### A. History and Structure of Sandler Bros.

Located in Biddeford, Maine, Sandler Bros. is a small wholesaler of fruits and vegetables subject to the provisions of PACA and the accompanying regulations promulgated by the Secretary of Agriculture.[6] Mark Sandler's grandfather and his grandfather's late cousin founded Sandler Bros. in 1929. The company eventually passed to the sons of the founders, Mark's father, Herbert Sandler ("Herbert"), and Herbert's cousin, James Sandler. Herbert and James Sandler each held 50 percent of the outstanding shares in the company.

Herbert ran and controlled the business and held the title of President until his death in January 2006. At that time, his share passed into his estate, where it remains. Marjorie, Herbert's widow and Mark's mother, is the personal representative and beneficiary of Herbert's estate, which presently holds 50 percent of the issued and outstanding shares of the company.

Marjorie is a resident of Longboat Key, Florida. She is not and never has been an employee, officer, or shareholder of Sandler Bros. She has never attended any meetings, conducted any business of the company, or reviewed any corporate documents. She was a director of Sandler Bros. until November 2008, when she resigned. In her capacity as director, she played no active role in the operation or management of the company. She had no responsibility for purchasing products from suppliers, handling company funds, or operating any aspect of the company.

---

[5] Much of the information submitted in support or in opposition to the instant motions accords with the Court's recent Order on Motion for Attachment and Trustee Process in a related case. (See Docket # 44 in Peter Condakes Co., Inc. v. Sandler Bros., D. Me. Docket No. 09-cv-168-P-S ("Condakes").) Indeed, Plaintiffs expressly rely on the declarations submitted in connection with the Condakes attachment. (See, e.g., Pls.' Mem. (Docket # 22) at 3.) Thus, the Court's factual exposition in this Order tracks its earlier recitation, as appropriate.

[6] During the relevant period, Defendants operated under PACA license number 19741254. (See Aff. of Peter Alphas (Docket # 23) ¶ 6.)

Mark has worked sporadically for the business since he was a teenager. He has never owned any shares in the company, and has focused on sales, plant operations, and personnel matters. Moreover, Mark avers that he never managed the company's financial affairs, was never given any responsibility for them, and never reviewed any company financial statements; that he rarely received bills or invoices from customers; and that he rarely wrote checks to pay any of the company's bills. That said, shortly after his father's death, Mark became President of Sandler Bros, and eventually became a director of the company.

In August or September 2006, Candice O'Brien, a non-family member who had been working for the company, purchased James Sandler's 50-percent share in the company. Prior to September 2007, an employee named Norman Petit handled all of the accounts payable and most of the accounts receivable work for Sandler Bros. At some point thereafter, O'Brien and Mark formally divided up the oversight and management responsibilities between them: Mark would maintain his existing responsibilities and O'Brien would manage the company's financial affairs. Ultimately, O'Brien became a director and was given the title of Treasurer and Vice-President.

### B.     Friction Between Mark Sandler and Candice O'Brien

Mark states that sometime in January or February 2009, he began to suspect that the company was in jeopardy. One of the two secretaries that worked in the office informed him on several occasions that O'Brien refused to take any calls from vendors or creditors. During that time, Mark also received calls from vendors who informed him that the company was failing to make payments. Each time he received a call, he told O'Brien about it and asked that she pay the vendor; O'Brien assured him that she would do so.

At some point after Mark received these phone calls, he learned that certain Boston vendors were requiring the company to pay for all produce in cash. Because of the secretary's

4

report and the suppliers' calls, Mark grew very concerned about the company's solvency. Consequently, he did not draw a salary from the company in January, February, or March 2009, and took steps to investigate. By March 2009, Mark avers, it had become clear that the company was in financial trouble: he had not drawn a paycheck in three months and was unable to control O'Brien. Consequently, Mark resigned as President and director of the company on March 20, 2009.

On April 6, 2009, Plaintiffs received a notice from O'Brien stating that Mark had taken a position with a competitor and that Sandler Bros. continued to operate.[7]

### C. The Parties' Interaction

Plaintiffs are fruit-and-produce wholesalers in or near the New England Produce Center in Chelsea, Massachusetts. They have enjoyed longstanding commercial relationships with Sandler Bros.

On March 27, 2008, four of the thirteen Plaintiffs filed suit against Sandler Bros., Mark, Marjorie, and O'Brien in this court seeking, inter alia, judgment in the sum of $100,756.43 on account of Sandler Bros.' failure to pay for produce.[8] That case was titled Grant Stanton Produce Co., Inc. v. Sandler Bros, Civil No. 08-99-P-S (D. Me.) ("Grant Stanton"). Mark filed an Answer to that Complaint on April 28, 2008, and Marjorie filed an Answer on June 2, 2008. Ultimately, on January 29, 2009, this Court granted a consent motion by the Grant Stanton

---

[7] (See Ex. 2 to Aff. of Steven Piazza (Docket # 25-7).)

[8] (See Compl. (Docket # 1) in D. Me. Docket No. 09-cv-99-P-S, ¶¶ 52-67.) The Grant Stanton plaintiffs were Grant Stanton Produce Company, Inc., State Garden, Inc., Tropical Banana Company, Inc., Waldo H. Lailer & Company, Inc., and J. Maheras Company, Inc., only the last of which is not a party here.

plaintiffs, Sandler Bros., Mark, and O'Brien for entry of stipulated judgment, and granted Plaintiffs' motion to dismiss their Complaint against Marjorie without prejudice.[9]

On May 26, 2009, Plaintiffs filed the instant action against Sandler Bros., O'Brien, Mark individually and as a trustee of The Herbert A. Sandler Revocable Trust ("Herbert Trust"), Michelle L. Paulsson as a trustee of the Herbert Trust, and Marjorie as the personal representative of Herbert's estate and a trustee of the Herbert Trust, seeking, inter alia, a total of $285,496.00 on account of Sandler Bros.' failure to pay produce invoices, plus the outstanding balance on the judgment entered in Grant Stanton.[10] All told, Plaintiffs state that the "total amount of the indebtedness now due [], including the judgment in [Grant Stanton,] now exceeds $348,000.00, plus interest at rates ranging from 12% to 18% per year and attorneys fees and continues to grow."[11] Moreover, they seek to hold the individuals Defendants jointly and severally liable for that sum as "responsibly connected" persons under PACA.[12]

### D. Related Litigation

On April 30, 2009, Peter Condakes Co., Inc. filed suit against Sandler Bros., Mark, Marjorie, and O'Brien in this court seeking, inter alia, judgment in the approximately amount of $75,000 on account of Sandler Bros.' failure to pay for produce.[13] That case is titled Peter Condakes Co., Inc. v. Sandler Bros, Civil No. 09-168-P-S (D. Me.) ("Condakes").

---

[9] (See Order on Pending Motions (Docket # 37) in D. Me. Docket No. 09-cv-99-P-S.) Marjorie had declined to enter into a settlement agreement with the Grant Stanton plaintiffs, maintaining that she could not be held personally liable for Sandler Bros.' debt to them. (See Def. Marjorie Sandler's Opp'n to Pls.' Mot. for Dismissal of Compl. Against Marjorie Sandler Without Prejudice (Docket # 32) in D. Me. Docket No. 09-cv-99-P-S.)

[10] (See Compl. (Docket # 1).)

[11] (Pls.' Mem. (Docket # 22) at 4.)

[12] (See Compl. (Docket # 1) ¶¶ 108-114.)

[13] (See Compl. (Docket # 1) in D. Me. Docket No. 09-cv-168-P-S.)

### E. Present Status of Sandler Bros.

Due to financial hardship, Sandler Bros. recently went into receivership in Maine state court. However, the appointed receiver, Windsor Associates, LLC ("Windsor"), has since filed its notice of resignation.[14] Windsor's Final Accounting and Report has been filed in Condakes.[15]

## III. DISCUSSION

### A. Motion for Attachment (Docket # 20)

"Enacted in 1930, PACA had the intent of preventing unfair business practices and promoting financial responsibility in the fresh fruit and produce industry." Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 282 (9th Cir. 1997) (citation and internal punctuation omitted). "In addition to protecting consumers, Congress expressly designed [PACA] to protect the producers of perishable agricultural products, most of whom must entrust their products to a buyer who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing." Weis-Buy Servs., Inc. v. Paglia, 411 F.3d 415, 421 (3d Cir. 2005) (citation and internal punctuation omitted). As the First Circuit explained:

> In 1984, Congress amended PACA by creating a statutory trust over any goods, receivables, or proceeds from perishable agricultural commodities until the buyer makes full payment. The commodities, receivables, or proceeds [must] be held by such commission merchant, dealer or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. In essence, PACA creates a trust in favor of the seller of the unpaid goods which is superior to the interest of the buyer's secured lender. One result is that the *res* of the trust is subject to the seller's lien and never becomes part of the buyer's estate in the event of the buyer's bankruptcy.

Hiller Cranberry Prods., Inc. v. Koplovsky, 165 F.3d 1, 4-5 (1st Cir. 1999) (citations and internal punctuation omitted). Moreover, "[a]n individual who is in the position to control the trust assets

---

[14] (See Mot. to Withdraw (Docket # 27) in D. Me. Docket No. 09-cv-168-P-S, at 2.)

[15] (See Resp. to Summons to Trustee (Docket # 64-2) in D. Me. Docket No. 09-cv-168-P-S.)

7

and who does not preserve them for the beneficiaries has breached a fiduciary duty" and may be held personally liable for that breach, assuming that corporate assets are insufficient to satisfy PACA liability. Id. at 8-9; see also Sunkist Growers, 104 F.3d at 282-83; Weis-Buy Servs., 411 F.3d at 420-22; In re Ozcelik, 267 B.R. 485, 490 (Bankr. D. Mass. 2001); Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993). "Personal liability under PACA requires only that trust assets be used for some purpose other than repayment to the seller. This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities." Ozcelik, 267 B.R. at 490-91 (citations and internal punctuation omitted).

In sum, "a PACA trust [] imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier." Hiller Cranberry Prods., 165 F.3d at 9. Mindful of the First Circuit's admonition that PACA, "a remedial statute[,] should be given a liberal construction in favor of promoting Congress' intended purpose," id. at 6, the Court now turns to the potential liability of Sander Bros., Mark Sandler, and Marjorie Sandler.

### 1. Sandler Bros.

Sandler Bros. is unrepresented in this case[16] and has not opposed Plaintiffs' motions. In any event, the Court concludes that it is more likely than not that Plaintiffs will recover judgment against Sandler Bros.[17] Plaintiffs have adduced uncontested evidence that they sold and shipped perishable agricultural commodities to Sandler Bros., for which the latter agreed to pay at least

---

[16] Of course, a corporation cannot represent itself and may litigate only through a licensed attorney. See Instituto de Educacion Universal Corp. v. United States Dep't of Educ., 209 F.3d 18, 22 (1st Cir. 2000); In re Las Colinas Dev. Corp., 585 F.2d 7, 13 (1st Cir. 1978); Perez v. Berhanu, 583 F. Supp. 2d 87, 89 n.2 (D.D.C. 2008); Spickler v. York, 566 A.2d 1385, 1390 (Me. 1989).

[17] None of the Defendants has shown that there is any insurance, bond, or other security, or any property or credits attached by other writ of attachment or by trustee process, available to satisfy any judgment against one or more of them in this case.

8

$285,496; that the commodities were accepted without objection; that a detailed invoice accompanied each transaction; that Sandler Bros. has failed to pay for the commodities.

Plaintiffs seek an attachment in the amount of $400,000, which includes the cost of the commodities, the unpaid balance of the Grant Stanton judgment, and interest at rates ranging from 12% to 18% per year and attorney's fees. However, the record contains no evidence regarding the Grant Stanton balance: Plaintiffs' Motion for Injunctive Relief indicates that $63,000 remains unpaid,[18] but Plaintiffs neglected to submit supporting affidavits from any of the Grant Stanton plaintiffs averring to this fact. This failure to set forth "specific facts sufficient to warrant the required findings" prevents the Court from ordering attachment in the amount of the Grant Stanton balance. Me. R. Civ. P. 4A(i); see also id. 4B(c). Nor have Plaintiffs adduced record evidence from which interest and attorney's fees could be determined.

Accordingly, entry of an order of attachment in the amount of $285,496.00 against Sandler Bros. is appropriate.

### 2. Mark and Marjorie Sandler

Again, personal liability as a PACA trustee arises when "[a]n individual who is in the position to control the trust assets [] does not preserve them for the beneficiaries." Hiller Cranberry Prods., 165 F.3d at 8-9; see also Sunkist Growers, 104 F.3d at 282-83; Weis-Buy Servs., 411 F.3d at 420-22; In re Ozcelik, 267 B.R. 485, 490 (Bankr. D. Mass. 2001); Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993). "A court considering the liability of the individual may look at the closely-held nature of the corporation, the individual's active management role and any evidence of the individual's acting for the corporation." Produce Alliance, L.L.C. v. Green Apple Produce, Inc., No. Civ. 04-278-S-EJL, 2005 WL 1153616, at *4 (D. Idaho May 16, 2005) (citation and internal punctuation omitted).

---

[18] (See Pls.' Mot. for Injunctive Relief (Docket # 21) at 1.)

In short, the Court's assessment of the individual Defendants' PACA liability in this case mirrors its ruling in Condakes: entry of an order of attachment is appropriate as to Mark Sandler, but not as to Marjorie Sandler.[19]

Mark continues to oppose attachment against him for two reasons: first, that he was not a trustee of the PACA trust arising in favor of Plaintiff because he was not in a position to control the trust assets and, second, that he did not play a role in causing Sandler Bros. to breach the trust. As to the first objection, Mark's status as Sandler Bros.' President and one of its directors and principals, together with his active involvement in the day-to-day management of its affairs, including its financial affairs, suffice to establish that it is more likely than not that he was in a position to control the trust assets during the relevant period. See, e.g., id., at *7. As to the second objection, Mark's failure to ensure the preservation of trust assets establishes that it is more likely than not that he had a role in the breach of the PACA trust arising in favor of Plaintiff. See In re Ozcelik, 267 B.R. at 490. Accordingly, entry of the modified order of attachment against Mark Sandler is appropriate.

On the other hand, the Court continues to view Marjorie as a generally passive director on whom it would be inappropriate to impose individual liability. Plaintiffs point to nothing more than Marjorie's titular status within Sandler Bros. and her awareness of the Grant Stanton litigation. But as the Court previously explained, this evidence does not establish that it is more likely than not that Marjorie possessed sufficient control of the trust assets so as to expose her to personal liability.[20] See, e.g., Bear Mountain Orchards, Inc. v. Mich-Kim, Inc., Civil Action Nos. 07-853, 07-892, 2008 WL 4710920, at *5 (E.D. Pa. Oct. 22, 2008) (holding that "in small corporations with multiple officers, an individual may hold an office but, for entirely legitimate

---

[19] (See Docket # 44 in D. Me. Docket No. 09-cv-168-P-S, at 12-17.)

[20] (See Docket # 44 in D. Me. Docket No. 09-cv-168-P-S, at 14-17.)

purposes, not play an active role in control of the company's affairs and thus should not be automatically liable"). In sum, the record evidence presently available does not justify entry of an order of attachment against Marjorie Sandler.

### B. Motion for Injunctive Relief (Docket # 21)

Plaintiffs also seek injunctive relief that would restrain Defendants from "changing the status quo" of any corporate assets and compel the delivery to Plaintiffs' counsel of corporate books, records, and documents, as well as a complete monthly list of all real estate interests.[21] In determining a motion for a preliminary injunction, the Court must consider: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." Gonzalez-Droz v. Gonzalez Colon, No. 08-1437, 2009 WL 2184819, at *3 (1st Cir. July 23, 2009) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 65(a). The Court's analysis typically focuses on the first two factors, and "irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

Plaintiffs rightly observe that equitable relief may be available where the threat posed by the dissipation of trust assets and the debtor's financial instability renders money damages inadequate. See Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc., 222 F.3d 132, 139 (3d Cir. 2000); Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 159 (11th Cir. 1990). However, Plaintiffs have not demonstrated that irreparable harm—namely, the dissipation of trust assets— will occur in the absence of their requested equitable relief. Although Sandler Bros. appears to have ceased operations, corporate assets have been delivered to Attorney David McConnell, who

---

[21] (Ex. 1 to Pls.' Mot. for Injunctive Relief (Docket # 21-2) at 4.)

represents Mark and Marjorie Sandler, or have been placed in a receivership bank account.[22] Moreover, the existence of a PACA trust gives Plaintiffs all the protections described in the statute and associated regulations, which require Defendants "to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to" Plaintiffs. 7 C.F.R. § 46.46(d)(1); see also 7 U.S.C. § 499b(4).

The Court concludes that Plaintiffs' injury, though substantial, is adequately compensable by money damages, thus rendering preliminary injunctive relief inappropriate. See JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990); see also Ross-Simons Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18-19 (1st Cir. 1996).

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that Plaintiffs' Motion for Attachment (Docket # 20) is GRANTED IN PART as to Defendant Sandler Bros. and Defendant Mark Sandler, and DENIED IN PART as to Defendant Marjorie Sandler. Plaintiffs' Motion for Injunctive Relief (Docket # 21) is DENIED as to all Defendants.

It is further ORDERED that attachment be made against the property and credits of Defendant Sandler Bros. and Defendant Mark Sandler in the amount of Two Hundred and Eighty-Five Thousand, Four Hundred and 96/100 Dollars ($285,496.00).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 18th day of August, 2009.

---

[22] (See Resp. to Summons to Trustee (Docket # 64-2) in D. Me. Docket No. 09-cv-168-P-S.)